UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Evergreen Power, LLC and<br>Asnat Realty, LLC<br>    Plaintiffs | :<br>:<br>:<br>: | 3:12-CV-00032 (SRU) |
| v. | :<br>: | |
| United Illuminating Company<br>    Defendant | :<br>:<br>: | July 30, 2012 |

**Memorandum Of Law In Support Of:
Plaintiffs' Motion For Partial Summary Judgment As To Liability
On The First And Fourth Counts Of The Second Amended Complaint**

This *Memorandum* is filed in support of *Plaintiffs' Motion for Partial Summary Judgment*. In accordance with FRCP Local Rule 56(a)1, plaintiffs' *Local Rule 56(a)1 Statement* ("LRS") is annexed to their *Motion for Partial Summary Judgment*. The plaintiffs seek partial summary judgment as to the defendant's CERCLA liability,[1] as alleged in the First and Fourth Counts of the *Second Amended Complaint* dated April 18, 2012 ("Complaint"). As discussed herein, and supported by the LRS and attachments thereto, plaintiffs have established the elements of a prima facie case and there are no genuine, relevant issues of fact to be tried as to the defendant's CERCLA liability.

**I.    INTRODUCTION**

This matter involves the contamination and ongoing investigation and clean up of a power generation facility on certain real property ("Site" or "Property") located in New Haven, Connecticut between and abutting the East and West Branches of the Mill River.

---

[1] For purposes of this motion only, plaintiffs refer to "defendant's CERCLA liability" as a prior *owner* and *operator*, as alleged in the First Count. Plaintiffs' additional claim that UI has CERCLA liability as an *arranger* (Second Count) is not addressed in this motion.

History Of Property Ownership And Use:

The Property consists of 8-9 acres built from dredge spoils, including those removed from the abutting Mill River East Branch and Mill River West Branch over a period of time from 1900 to 1953.  LRS, ¶5-6.[2]  The Property encompasses both the former "Station B" building along Grand Avenue, and "English Station" on the southern end of the site.  LRS, ¶7.  UI owned and operated the Property from (at least[3]) 1914 through August of 2000.  LRS, ¶¶8-10 & 24.  Power generation in the Station B building stopped in the 1920s (prior to the time that Polychlorinated Biphenyls ("PCBs") were brought into commercial use); however, UI subsequently used the Station B building for storage of PCB-containing materials and equipment.  LRS, ¶11.

UI conducted power generation operations on the Property until 1992, when power generation at the Property ceased.  LRS, ¶13, *see also* ¶¶12 & 14.  At the time UI sold the Property in August of 2000, the former English Station facility occupied approximately 100,000 square feet and included out-of-service electrical equipment containing PCBs.  LRS, ¶12.  In fact, most, if not all, electrical transformers and capacitors used and stored at the Site must be presumed to contain PCBs because of the widespread use of such PCB-containing equipment in the electric industry.  LRS, ¶12.  In addition, in the course of its operations, UI sprayed PCB-containing waste oil as an outdoor dust control measure.  LRS, ¶22.

---

[2] *Plaintiffs' Local Rule 56(a)1 Statement* ("LRS") is appended to *Plaintiffs' Motion For Partial Summary Judgment*.  In this Memorandum, reference is made to the paragraphs of the LRS. Affidavits and other documentation supporting statements of fact are cited in, and attached as exhibits to, the LRS.

[3] On information and belief, UI is likely a successor to (or was re-named following a merger with) the former New Haven Electric Company, which owned and operated the Site prior to 1914.  However, Plaintiffs do not claim this fact as undisputed for purposes of summary judgment and do not rely on it to establish their prima facie case for CERCLA liability.

2

As stated, UI ceased power generation and subsequently, in August of 2000, sold the Property to Quinnipiac Energy, LLC ("QE"). LRS, ¶¶13, 14, & 23-25. QE *hoped* to operate the Site as a power generation peaking facility; however, at the time of the sale it did not hold all of the necessary permits to do so. LRS, ¶27. QE's efforts to obtain at least one of the necessary permits failed and QE never operated the Site. LRS, ¶¶28-29. During its period of ownership, QE did not bring onto the Site any equipment or substances that likely would contain PCBs. LRS, ¶30. QE sold the Property to the plaintiffs in December of 2006. LRS, ¶4. During their term of ownership, plaintiffs have not generated power or operated any other business on the Site and have not brought onto the Site any equipment or substances that likely would contain PCBs. LRS, ¶31. Therefore, **all PCBs** removed from and currently present on the Site, including PCB-containing oil in equipment and PCBs impacting Site soils, sediment, ground water, concrete, asphalt, or structures, **arrived at the Site during UIs ownership and operation of the Site**. LRS, ¶32 (as supported by the LRS paragraphs cited therein).

Environmental Investigation And Remediation:

Some environmental investigation, remediation, and removal work ("Work") has been conducted at the Site. LRS, ¶33. Some of that Work was conducted by or for UI during its ownership (LRS, ¶¶34-35) and additional Work was completed during QE's ownership (LRS, ¶36). During the QE time period, Work was conducted for QE by Advanced Environmental Interface, Inc. LRS, ¶¶36-37. The Work is not complete, PCBs are present in the soils and other materials on Site, and conditions exist at the Site which pose a potential threat of release to soils, groundwater, and surface waters. LRS, ¶38. *Significant Environmental Hazards* ("SEHs") have been identified in eight locations on the Property due to the presence of high levels of PCBs. LRS, ¶39. Plaintiffs have also performed Work, including additional investigative work and

removal activities conducted by Marc Casslar, LEP of GeoQuest, Inc. LRS, ¶¶40 & 43. In addition, Plaintiffs have engaged John Insall, LEP of Stantec to develop a Site Wide Remedial Action Plan for submission to the United States Environmental Protection Agency ("U.S. EPA") and the Connecticut Department of Energy and Environmental Protection ("CT DEEP"), a necessary next step for a CERCLA quality clean up. LRS, ¶¶40 & 45.

## II.  LAW AND ARGUMENT

### A.  Standard of Law:

The standard of law with respect to summary judgment was well summarized by this Court:

> Summary judgment is appropriate when there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Therefore, to defeat summary judgment, evidence must be presented upon which a jury could reasonably find for the non-movant.

*Marczeski v. Handy*, 2004 U.S. Dist. LEXIS 22167, *2 (D. Conn. 2004) (internal citations and quotation marks omitted). The plaintiffs, as the moving parties here, have the burden of showing that no triable issues of fact exist and, therefore, inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). However, to avoid summary judgment, the defendant must identify a genuine triable issue as to a <u>relevant</u> fact.

> When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must present significant probative evidence to create a genuine issue of material fact. A party may not create a genuine issue of material fact by merely presenting unsupported statements. Conclusory allegations or unsubstantiated speculation on the part of the non-movant is insufficient to defeat summary judgment. Therefore, the non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts or defeat the motion through mere speculation

4

or conjecture. Instead, to defeat summary judgment the non-moving party must produce specific, particularized facts indicating that a genuine factual issue exists.

*Marczeski*, at *2-3 (internal citations and quotation marks omitted).

### B. Plaintiffs Have Established a Prima Facie Case for CERCLA Liability:

There are no genuine issues of fact to be tried with respect to the issue of the defendant's liability under CERCLA in this matter. The elements of a *prima facie* case for CERCLA liability are:

(1) the defendant is within one of the four categories of responsible parties enumerated in 42 U.S.C. § 9607(a);

(2) the site is the facility as defined in 42 U.S.C. § 9601(9);

(3) there is a release or threatened release of a hazardous substance at the facility;

(4) the plaintiff incurred costs responding to the release or threatened release; and

(5) the costs were incurred for necessary response actions substantially in compliance with the national contingency plan.

*See e.g. ABB Indus. Sys. v. Prime Tech.*, 120 F.3d 351, 356 (2d Cir. 1997); *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 808 F. Supp. 2d 417, 488 (N.D.N.Y. 2011); *K.V.L. Corp. v. Holson Co.*, 2000 U.S. Dist. Lexis 22955, *110 (D. Conn. 2000).

As discussed in this memorandum, and with reference to the LRS and attachments thereto, the plaintiffs have met their burden of supporting a *prima facie* case for UI's CERCLA liability. Therefore, UI may avoid partial summary judgment on liability only by establishing a genuine issue of fact relevant to an element of that prima facie case, or by establishing the applicability of one of the four limited statutory defenses available pursuant to 42 U.S.C. § 9607(b) (that the release or threatened release was caused by an act of God, an act of war, certain

acts or omissions of third parties other than those with whom the defendant had a contractual relationship, or some combination of these reasons).[4]

1.      <u>Defendant falls within two of the four categories of responsible parties</u>.

Potentially responsible parties ("PRPs") under CERCLA must meet the broad definition of "person" set forth at 42 U.S.C. § 9601(21); pursuant to that definition, corporations are persons. UI is a Connecticut corporation (LRS, ¶3) and, therefore, a person for purposes of CERCLA.

A defendant must also fall within the requirements of one or more of the four categories of PRPs set forth in 42 U.S.C. § 9607(a). The second category of PRPs includes two sub-categories:

> any person who at the time of disposal of any hazardous substance **owned** <u>or</u> **operated** any facility at which such hazardous substances were disposed of.

42 U.S.C. § 9607(a)(2)(emphasis added). Having both owned and operated the Property at the time of disposal, UI is liable under both of these subcategories. As noted (*supra* fn1) defendant's arranger liability under the third category of PRPs is not addressed by this motion.

a.      <u>Owner at the time of disposal</u>.

The first sub-category of potentially responsible parties includes <u>owners</u> of a facility <u>at the time of disposal</u>. 42 U.S.C. § 9607(a)(2). Disposal is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may

---

[4] UI's generic, boilerplate affirmative defenses do not provide sufficient specificity to allow plaintiffs to address them at this time; the defenses are not directed to particular counts of the Complaint, and contain no allegations of fact, disputed or otherwise. *See* LRS Exhibit 2 (*Answer to Second Amended Complaint*), pp. 10-13. If in fact properly raised in opposition to CERCLA <u>liability</u> under the First and Fourth Counts, plaintiffs must address such defenses in their reply.

enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3) as incorporated by 42 U.S.C. § 9601(29).

It is undisputed that UI owned the Property from 1914 to August 16, 2000.  LRS, ¶¶8-9 & 23-25.  UI admits that hazardous substances were disposed of at or on the Property prior to the sale to QE, including PCBs.  LRS, ¶26.  The evidence conclusively demonstrates that PCBs were discharged or deposited (sprayed) onto the Property by UI, and that additional PCB-containing materials (oil, equipment, etc.) were deposited, dumped, spilled, leaked or otherwise placed on the Property during UI's ownership.  LRS, ¶¶15-17, 19, & 22.  In fact, **all PCBs** (both removed to date and currently located on or at the Property, including PCBs in soils and equipment) **came to the Property on UI's watch**.  LRS, ¶32 (as supported by the LRS ¶s cited therein).  The defendant is an owner at the time of disposal and, therefore, a PRP pursuant to 42 U.S.C. § 9607(a)(2).

      b.      Operator at the time of disposal.

The second sub-category of potentially responsible parties includes operators of a facility at the time of disposal. 42 U.S.C. § 9607(a)(2).  It is also undisputed that UI operated on the Property from 1914 to at least 1992.  LRS, ¶¶10 & 13-14.  As discussed *supra*, hazardous substances, including PCBs, were disposed of on or at the Site during that time period. LRS, ¶¶26, 22, 15-17, & 21.  The defendant is an operator at the time of disposal and, therefore, a PRP pursuant to the operator subcategory of 42 U.S.C. § 9607(a)(2).

2.    The English Station Site is a facility.

A CERCLA facility is defined as:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft,

7

> or (B) **any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located**; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9) (emphasis added).

There is no question that hazardous substances have *come to be located* at the Site. LRS, ¶26. Hazardous substances under CERCLA include all substances designated by the U.S. EPA pursuant to 42 U.S.C. § 9602. *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1199-1200 (2d Cir. 1992). PCBs are a listed hazardous substance pursuant to 42 U.S.C. § 9601(14)(B) as they are a compound, mixture, solution, or substance designated pursuant to 42 U.S.C. § 9602 and listed in Table 302.4 of 40 C.F.R. § 302. *See also* LRS, ¶16. The pervasive evidence is that PCBs are and have been present in a number of locations on the Property (*see e.g.* LRS, ¶15 and materials cited therein). UI has admitted that PCBs (and other substances) have "come to be located" on the Property. LRS, ¶26. The Property is a CERCLA facility.

3.      The release of hazardous substances has occurred at the Site.

There have been releases of hazardous substances at the Site. LRS, ¶15. CERCLA liability requires that there be a release or threatened release of a hazardous substance at the facility. 42 U.S.C. 9607(a). With certain exclusions not relevant here, a release is defined as:

> ... any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . .

42 U.S.C. § 9601(22). UI's spraying of PCB-containing oils (LRS, ¶22) alone would constitute a "release" into the environment. However, site wide releases of PCBs have been identified, including a number of Significant Environmental Hazards ("SEHs") identified on the Property due to the presence of high levels of PCBs. LRS, ¶¶15, 22, & 39; *see also* ¶¶19, 32-33, & 38.

4.     <u>Plaintiffs have incurred response costs</u>.

The plaintiffs have incurred response costs with respect to releases of hazardous substances, including PCBs, at the English Station Site.  LRS, ¶¶40, 43, 45, & 47.  Costs incurred include (without limitation): costs associated with Work performed (or supervised) by Marc Casslar of GeoQuest, Inc. and by John Insall of Stantec Consulting Services, Inc.  LRS, ¶¶40, 43, 45, & 47.

5.     <u>Plaintiffs' costs are recoverable</u>.

To establish <u>liability</u>, a plaintiffs burden is to establish it has incurred <u>some</u> recoverable response costs.  42 U.S.C. § 9607(a)(4)(B); *SPS Limited Partnership, LLP v. Severstal Sparrows Point, LLC*, 808 F. Supp. 2d 794, 804 (D. Md. 2011) (citing *Sherwin-Williams Co. v. ARTRA Grp., Inc*., 125 F. Supp. 2d 739, 752 (D. Md. 2001)).  In support of this motion, it is not necessary for the plaintiffs to present all of their incurred costs, or to prove that each and every incurred cost is recoverable (*i.e.* necessary and substantially consistent with the NCP).[5]  *SPS Limited,* at 804 (citing *Weyerhaeuser v. Koppers Co., Inc.*, 771 F. Supp. 1406, 1413 (D. Md. 1991)); *S.C. Elec. & Gas Co. v. UGI Utils., Inc.*, 2012 U.S. Dist. Lexis 61487, *131-132 (D. S.C. 2012).  The plaintiffs have met their burden of establishing recoverable response costs in support of their prima facie case for liability; a more detailed and comprehensive analysis of costs can be left to the damages phase.  *Sherwin-Williams Co. v. ARTRA Group, Inc.*, 125 F. Supp. 2d 739, 753 (D. Md. 2001) (plaintiff having met is burden for liability purposes, "more proof may be considered as to which specific costs were or were not consistent with the NCP at the damages phase").

---

[5] Therefore, plaintiffs reserve the right to offer evidence as to additional costs (costs not cited or supported in the LRS) as appropriate in the damages phase of this litigation.

The response actions taken by the plaintiffs, and the costs thereby incurred, for investigation, removal, and preliminary remedial actions to address PCB contamination at the Site were necessary and substantially consistent with the National Contingency Plan ("NCP"). Plaintiffs have conducted some removal activities (and some removal and/or remedial activities were performed prior to plaintiffs' purchase of the Property); however, the bulk of the Work to date has been investigation and evaluation. *See* LRS, ¶¶33-36, 38, & 43. As discussed below, a site wide Remedial Action Plan for PCBs is currently being developed for submission to U.S. EPA and CT DEEP. LRS, ¶45.

At this stage, prior to final remedy selection, many of the NCP requirements do not apply to the Work performed by the plaintiffs. "A private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in **substantial compliance** with the **applicable** requirements in paragraphs (5) and (6) of this section, and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i) (emphasis added); *see also K.V.L. Corp. v. Holson Co.*, 2000 U.S. Dist. Lexis 22955, *117 (D. Conn. 2000); *Nashua Corp. v. Norton Co.*, 116 F. Supp. 2d 330, 353 (N.D.N.Y. 2000) (recognizing that not all NCP requirements are applicable to investigative stage and noting that "the NCP sets no explicit time limit on the initial investigatory phase"). "Response actions will not be considered inconsistent with the NCP based on immaterial or insubstantial deviations from the NCP." 40 C.F.R. §300.700(c)(4).

Plaintiffs engaged Marc Casslar and John Insall to perform certain Work. LRS, ¶¶43 & 45. Mr. Casslar and Mr. Insall are both well qualified and experienced Connecticut Licensed Environmental Professionals. LRS, ¶48. The Work performed by these LEPs, including

investigation work, removal work, and the development of a RAP for submission to U.S. EPA and CT DEEP), was necessary and, to the extent required, substantially consistent with the NCP.

    a.    <u>Investigation</u>.

Plaintiffs have incurred necessary costs of investigation of releases of PCBs at the Property (LRS, ¶¶42-44); these investigation costs are recoverable without considering NCP compliance.

> The costs of initial investigation and monitoring of a release are recoverable, however, without such a showing. *Gache v. Town of Harrison*, N.Y., 813 F. Supp. 1037, 1046 (S.D.N.Y. 1993) ("initial preliminary investigatory and monitoring costs are recoverable irrespective of the recoverability of other costs or compliance with the requirements of the NCP"); *see also Carlyle Piermont Corp. v. Federal Paper Bd. Co.*, 742 F. Supp. 814, 821 (S.D.N.Y. 1990); *Artesian Water Co. v. Gov. of New Castle County*, 659 F. Supp. 1269, 1294 (D. Del. 1987).

*City of New York v. Chemical Waste Disposal Corp.*, 836 F. Supp. 968, 980 (E.D.N.Y. 1993) (holding "defendants are liable for plaintiff's investigation and monitoring costs without considering compliance with the NCP").  Therefore, these costs alone support the finding of recoverable costs necessary to in turn support a finding of CERCLA liability.

    b.    <u>Removal Action</u>.

The NCP requirements for a removal action are less stringent than those for a remedial action. *K.V.L. Corp, at* *111-112.  This dichotomy reflects the short term, immediate nature of removal actions and the long term, permanent solution focus of a remedial action.

> The terms "remove" or "removal" means [mean] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary

> evacuation and housing of threatened individuals not otherwise provided for, action taken under section 104(b) of this Act [42 USCS § 9604(b)], and any emergency assistance which may be provided under the Disaster Relief Act and Emergency Assistance Act.

42 U.S.C. § 9601(23). NCP consistency can be established on a showing of state agency and/or U.S. EPA involvement. *See e.g. N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 808 F. Supp. 2d 417, 522 (N.D.N.Y. 2011); *Pfohl Bros. Landfill Site Steering Comm. v. Browning-Ferris Indus. Of N.Y., Inc.*, 2004 U.S. Dist. Lexis 28367, *22 (W.D.N.Y. 2004).

Electrical equipment located on Site when UI transferred the Property to QE remained on the Property when the plaintiffs purchased it. LRS, ¶¶12, 31-32, & 43. That abandoned equipment contained PCB oils, presented a threat of release to the environment, and needed to be addressed. LRS, ¶¶42-43. In addition, based on the age and condition of the equipment, and in compliance with applicable regulations, the areas around that equipment needed to be tested for releases of PCBs. LRS, ¶43. The plaintiffs conducted a removal action including: identification of PCB-containing equipment, sampling and properly disposing of the oils contained in the equipment, sampling of the equipment itself, and sampling of the areas under and around the abandoned equipment. LRS, ¶43.

U.S. EPA and CT DEEP were involved with removal activities performed by GeoQuest; that involvement included requests by the agencies to perform the Work, and ongoing consultations as the Work was performed. LRS, ¶44. To the extent applicable, the requirements of the NCP are satisfied by U.S. EPA and CT DEEP's involvement in the removal action. Therefore, costs of the removal activities are recoverable and support plaintiffs' prima facie case for liability.

      c.     <u>Remedial Actions</u>.

While considerable Work was undertaken at the Property prior to plaintiffs' purchase, the parties conducting that Work did not address all areas of the Property and did not develop a site-wide plan for remediation. LRS, ¶¶33-36 & 38. The plaintiffs have engaged John Insall of Stantec Consulting Services, Inc. to develop and submit (to U.S. EPA and CT DEEP) a site-wide remedial action plan ("RAP"). LRS, ¶45. The RAP encompasses a self implementing plan and remedy selection pursuant to T.S.C.A. (40 C.F.R. Part 761), and is a necessary step in achieving a CERCLA quality remediation at this Site. LRS, ¶45.

John Insall is a well qualified Connecticut LEP. LRS, ¶48. Mr. Insall has consulted with U.S. EPA and CT DEEP regarding the development and submission of a draft RAP based on existing data and **both agencies agree it is a necessary next step in addressing the site wide PCB contamination.** LRS, ¶46. Mr. Insall has been directed to continue consulting with U.S. EPA and CT DEEP in the development of the RAP and, ultimately, will submit a draft RAP to both agencies for review and comment. LRS, ¶46. It is anticipated that, after reviewing and commenting on the draft RAP, U.S. EPA may require additional investigation and subsequent revisions to the RAP prior to finalization. LRS, ¶46. However, as noted, a draft RAP based on the currently available data is a necessary step in that process. LRS, ¶¶45-46.

The RAP work is currently ongoing. LRS, ¶47. Plaintiffs have already incurred some costs associated with the development of the draft RAP (LRS, ¶¶40 & 47), and have contracted to pay for completion of that work (LRS, ¶¶45 & 47). To the extent applicable, the requirements of the NCP are satisfied by U.S. EPA's (and CT DEEP's) involvement. Therefore, costs of the RAP development, a necessary remedial activity, are recoverable and support plaintiffs' prima facie case for liability.

**IV.     CONCLUSION**

Plaintiffs have demonstrated there is no genuine issue of fact to be tried with respect to each element of a *prima facie* case for CERCLA liability. Plaintiffs respectfully request that partial summary judgment be entered in the First and Fourth Counts as to the defendant's CERCLA liability.

                                          Respectfully Submitted,
                                          Plaintiffs
                                                            **/s/Alan M. Kosloff**
                                          _____
                                          By:     Alan M. Kosloff
                                                      Federal Bar #ct05554
                                                      Law Offices of Alan M. Kosloff
                                                      Their Attorneys
                                                      28 North Main Street
                                                      West Hartford, CT
                                                      Tel: 860-521-7004
                                                      Fax: 860-521-3352
                                                      akosloff@kosloff.net

## Certificate of Service

     I hereby certify that, on July 30, 2012 a copy of the foregoing *Memorandum of Law in Support of Motion for Partial Summary Judgment* was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

                                      **/s/Alan M. Kosloff**
                                      Alan M. Kosloff

Filing location:

D. Conn. - Electronic Filing
Chamber Copies Per Electronic Filing Order (1/5/12)

Chambers: The Honorable Stefan R. Underhill
Brien McMahon Federal Building
United States Courthouse
915 Lafayette Boulevard - Suite 411
Bridgeport, Connecticut 06604