| | |
|---|---|
| EVERGREEN POWER, LLC and | : CIVIL ACTION NO. |
| ASNAT REALTY, LLC | : 3:12-CV-00032 (SRU) |
| | : |
| Plaintiffs, | : |
| v. | : |
| | : |
| UNITED ILLUMINATING | : |
| COMPANY | : |
| | : SEPTEMBER 10, 2012 |
| Defendant. | : |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

This action was commenced on January 5, 2012 by Plaintiffs, Evergreen Power, LLC ("Evergreen Power") and Asnat Realty, LLC ("Asnat"), (collectively, "Plaintiffs") against Defendant, The United Illuminating Company, ("UI" or "Defendant") to recover claimed costs pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601-75 ("CERCLA"). The claimed costs pertain to two parcels of property, Parcel A and Parcel B, or portions thereof, located at 510 Grand Avenue, New Haven, Connecticut and collectively referred to by Plaintiffs as the Property.

UI previously owned the Property on which it operated a power generating plant. UI transferred the Property to Quinnipiac Energy, LLC ("QE") on August 16, 2000 as part of UI's compliance with the requirements of Connecticut's electric utility restructuring legislation. See Conn. Gen. Stat. § 16-244f. UI petitioned for, and received, approval of the transfer of the Property from the Connecticut Department of Public Utility Control ("CT DPUC"). At a point prior to QE's transfer of the Property to Plaintiffs and for reasons not yet known to UI, QE subdivided the Property into Parcel A and Parcel B. QE then transferred Parcel A to Evergreen

Power on December 9, 2006 and Parcel B to Asnat on December 13, 2006; no conveyance tax was paid in connection with either of these transactions. While Plaintiffs refer to Parcel A and Parcel B as the Property, the respective ownership of these parcels has not changed since December of 2006.

In their Motion for Partial Summary Judgment dated July 30, 2012, Plaintiffs seek the Court's concurrence in their unfounded assertion that there are undisputed facts sufficient to satisfy Plaintiffs' burden to establish a prima facie case under the First and Fourth Counts of their Second Amended Complaint dated April 18, 2012. Plaintiffs' motion must fail because they have not in fact met their burden. There are genuine issues of material fact which have not been and must be resolved in Plaintiffs' favor in order for Plaintiffs to prevail in their effort to present a prima facie case for present and future recovery of response costs under the First and Fourth Counts of their Second Amended Complaint. Furthermore, there are facts that support a conclusion that Plaintiffs' §107(a) CERCLA private party cost recovery claim against UI is barred by the applicable six-year statute of limitations.

Included among the material facts which Plaintiffs must prove and have failed to demonstrate are undisputed are the following:

(a)     Whether Plaintiffs' costs were incurred in response to a release or threatened release of hazardous substances that occurred while UI was an owner of and operator at the Property;

(b)     Whether releases or threatened releases of hazardous substances that existed at the time of UI's transfer of the Property to QE in 2000 still existed at the time of Plaintiffs' acquisition of Parcel A and Parcel B, respectively, and/or Plaintiffs'

incurring of their claimed costs and, if so, where such releases or threatened releases occurred;

(c)     Whether Plaintiffs' claimed costs were necessary and consistent with the federal National Contingency Plan, 40 C.F.R. Part 300 ("NCP");

(d)     Whether Plaintiffs' claimed costs were in response to releases or threatened releases of hazardous substances at Parcel A and/or Parcel B that were caused by persons other than UI, including one or both of the Plaintiffs;

(e)     Whether costs that Plaintiffs claim they incurred are in fact response costs under §107(a) of CERCLA and not costs in response to conditions attributable and relating to recycling, scrapping, salvage and demolition activities conducted at the Property at the direction of, pursuant to one or more arrangements with, and/or for purposes of planned development or use of the Property by one or both of the Plaintiffs and/or QE;

(f)     Whether the circumstances at the Property resulting in the pending enforcement actions by the United States Environmental Protection Agency (EPA) and the Connecticut Department of Energy and Environmental Protection (CT DEEP) in September 2011 and February 2012, respectively, against Evergreen Power and Asnat and, with respect to the CT DEEP action, also against others affiliated or associated with Evergreen Power and Asnat, (collectively, "the CT DEEP and EPA Enforcement Actions"), have been resolved and whether any such resolution has resulted in response costs being incurred by Evergreen Power and Asnat that are response costs for which UI is liable under §107(a); and

(g)     That the statute of limitations applicable to an initial §107(a) cost recovery action under CERCLA, which limitation period is triggered by the commencement of remedial work performed at the Property, is not a bar to a §107(a) cost recovery action by Plaintiffs against UI.

As noted above, Plaintiffs' Complaint in this action was filed in January 2012. Plaintiffs' Second Amended Complaint was filed in April 2012. To date, there has been no discovery propounded in this action by either Plaintiffs or Defendant. Pursuant to the May 30, 2012 Report of Parties' Planning Meeting filed with the Court, discovery is to be completed by June 18, 2013. While this completion date does not foreclose discovery now, pending pursuit of same, UI states its belief that there are additional facts relevant to and/or in further support of UI's position that many facts material to Plaintiffs' claims pertinent to their First and Fourth Counts and therefore this Motion are in dispute and/or not yet available to Defendant. UI has not owned the Property for more than twelve (12) years and has not had full access to, inter alia, information relating to the CT DEEP and EPA Enforcement Actions and the relationship between Plaintiffs and QE, who reportedly leased the Property to Plaintiffs in 2005 and then transferred the Property to Plaintiffs in 2006. (See Affidavit of Elizabeth C. Barton, September 10, 2012 Exh. C at ¶¶9,10, 11).

For one or more of the reasons discussed further below, UI requests that the Court deny Plaintiffs' Motion for Partial Summary Judgment. Neither Evergreen Power nor Asnat has shown that there is no genuine dispute as to material facts and that they are entitled to judgment as a matter of law on the First and Fourth Counts of their Second Amended Complaint. As provided for in Rule 56(d), in the alternative, UI requests that the Court deny or defer a ruling on

Plaintiffs' Motion for Partial Summary Judgment. (See Affidavit of Elizabeth C. Barton, September 10, 2012, Exh. C).

## I.    BACKGROUND

### A. History of Ownership and Operation of the Property

This action involves real property located at 510 Grand Avenue in New Haven, Connecticut, abutting the East and West branches of the Mill River, and comprised of two parcels known as Parcel A and Parcel B. These two parcels are collectively (and conveniently for Plaintiffs) referred to by Plaintiffs for purposes of this action as the Property. (Pls.' Mot. at 2.) UI is the former owner and operator of an electric power generating station at the Property; UI placed this power generating station, otherwise known as English Station, into deactivated reserve in 1992. (Id.; Affidavit of Bohdan Katreczko, September 10, 2012, Exh. A at ¶8). While in deactivated reserve and until UI transferred the Property to QE in 2000, UI maintained the power generation equipment for the units in inactive reserve so that they would be ready and able to be reactivated. Until the transfer of the Property by UI to QE in 2000, the building housing the power generating equipment was kept in good repair, weather-tight and heated to protect all components necessary for the resumption of power generation at the Property. (Affidavit of Bohdan Katreczko, September 10, 2012, Exh. A at ¶8).

The statewide restructuring of the electric utility industry required that UI either fully divest or functionally separate its non-nuclear assets. See Conn. Gen. Stat. § 16-244f. UI actively marketed the Property to those who UI believed may have had an interest in the Property for either power generation or other commercial or industrial purposes. (Affidavit of Bohdan Katreczko, September 10, 2012, Exh. A at ¶12). Pursuant to a June 29, 2000 decision that followed public hearings on May 8, 2000 and May 15, 2000 regarding the contemplated transfer

to QE, CT DPUC approved the sale of the Property to QE, having considered evidence pertaining to the environmental conditions at the Property and concluding that "the property being sold is not needed in the performance of [UI's] provision of service to the public and that the transaction will financially benefit UI and its ratepayers." (Decision on Petition of the United Illuminating Company for Approval to Sell English Station, DPUC Docket No. 00-04-05, June 29, 2000, Exh. 27 at 10).

On August 16, 2000, UI transferred ownership and operation of the Property to QE, who, in furtherance of a plan to sell electricity generated at the Property in the wholesale market, had already commenced the approval processes for restart of the generating units placed in deactivated reserve by UI in 1992. On or about May 16, 2000, QE had filed an Application for Minor New Source Review Permits with CT DEEP. In August 2000, CT DEEP sought and received EPA's concurrence with CT DEEP's determination that QE's application was in fact not for a new source, but rather for a modification to an existing source. Accordingly, in September 2000, QE filed revisions to its application before CT DEEP, seeking permits that "would allow reactivation of two existing oil-fired boilers at the English Station facility at 510 Grand Avenue in New Haven." (In the Matter of Quinnipiac Energy, LLC, Proposed Final Decision, September 4, 2002, Application Nos. 200001616 and 200001617, Exh. 23 at 7). The Proposed Final Decision found that QE's proposed generating activity at the Property met the applicable statutory and regulatory standards and recommended issuance of the operating permits to QE. In the Final Decision of June 26, 2003, almost three years after UI's transfer of the Property to QE, the Commissioner agreed with the CT DEEP Hearing Officer that QE's generating activity met all current standards, but rejected the Proposed Decision's recommended issuance of the operating permits because of a concern that the New Haven area would not be

able to meet anticipated, but not yet promulgated, federal ambient air quality standards for certain air pollutants.  (In the Matter of Quinnipiac Energy, LLC, Final Decision, June 26, 2003, Application Nos. 200001616 and 200001617, Exh. 30 at 5).

There is a comprehensive federal regulatory scheme, complemented by a state regulatory scheme, that governs the use, disposal and distribution in commerce of polychlorinated biphenyls ("PCBs") and materials and equipment containing PCBs.  40 C.F.R. Part 761.  At the time of the transfer of the Property to QE in 2000, not all equipment remaining at the Property contained PCBs and any equipment containing PCBs that remained at the Property was in use and maintained by UI in compliance with state and federal regulations pertaining to such equipment; there was no release or threatened release from this equipment in 2000.  (Affidavit of Bohdan Katreczko, September 10, 2012, Exh. A at ¶15).   In 2000, uses by UI of PCBs that were authorized by the referenced comprehensive statutory and regulatory scheme governing PCBs also included the presence of PCBs in, for example, paint on an overhead crane that remained on the Property at the time of the transfer of the Property to QE.   (Affidavit of David F. Hurley, September 10, 2012 Exh. B at ¶¶ 16,18).  Authorized uses of PCBs, including certain PCB containing equipment, which were uses QE advised it intended to continue post-transfer, remained at the Property at the time of UI's transfer to QE in 2000. (Affidavit of Bohdan Katreczko, September 10, 2012, Exh. A at ¶¶15, 16).

With the transfer of the Property, QE, to the express exclusion of UI, took on all responsibility for any investigation and remediation of environmental conditions at the Property, with the exception of a bulkhead reconstruction project, which UI agreed to complete.  The transfer of the Property was subject to the Connecticut Transfer Act, Conn. Gen. Stat. §§ 22a-134, et seq.  QE was the Certifying Party for the filings required by the Connecticut Transfer

Act. As the Certifying Party, QE affirmatively agreed and committed to investigate and remediate the Property, including all conditions existing at the time of the transfer in 2000, in accordance with prevailing standards and guidelines, including Connecticut's Remediation Standards Regulations, R.C.S.A. §§ 22a-133k-1, et seq. (the "RSRs"). (Id. at ¶17). In anticipation of the transfer to QE, UI had GEI Consultants, Inc. ("GEI") prepare a draft site-wide Remedial Action Plan ("RAP") in 2000, together with an estimate of the costs to implement the RAP (the "RAP Cost Estimate"). (Id. at ¶20). The RAP Cost Estimate, as agreed upon by QE and UI, was $2,000,000. (Id. at ¶21). UI and QE executed a Remediation Escrow Agreement dated August 17, 2000 ("Escrow Agreement") further addressing the implementation of the site-wide RAP. The Escrow Agreement delineated the respective obligations and rights of UI and QE, including QE's successors and assigns, relative to pre-closing and post-closing environmental investigation and remediation work associated with the Property. (Id. at ¶19). UI paid to QE a closing adjustment in the amount of $4,250,000, and closing costs of $200,000. (Id. at ¶18). UI also funded the escrow fund created pursuant to the Escrow Agreement in the amount of $1,961,354, which was the amount of the RAP Cost Estimate, less certain costs incurred by UI prior to the transfer. (Id. at ¶21). As the reports cited by Plaintiffs and additional reports referenced below by UI undisputedly document, UI performed remedial actions prior to the transfer of the Property in 2000. Subsequent to the 2000 transfer, the monies in the Escrow Account were utilized by QE to fund AEI's investigation and further remediation of the Property and the implementation of the RAP. (Id. at ¶23).

In May 2005, QE leased the Property to Asnat and/or Evergreen Power. In December 2006, Asnat and Evergreen Power each elected to exercise its option to acquire a fee interest in their respective parcels (Letter from Nicholas J. Harding to Linda Randell, July 9, 2008, Exh. 28

[UI005648]; QE transferred Parcel A to Evergreen Power and Parcel B to Asnat. Pls.' Mot. at 3).

**B.      Environmental Conditions at and Remediation of the Property**

As set forth in Plaintiffs' Local Rule 56(a)1 Statement, UI performed environmental investigation, removal and remediation work during UI's ownership of the Property and QE performed work at the Property as well subsequent to QE's acquisition of the Property.  (See Pls.' Local Rule Statement § 33-37.)

1.      _Site filling_: Prior to 1835, the Property consisted of marsh and tidal flats.  Filling is believed to have occurred at the Property in as early as 1879.  By 1886, the northern portion had been filled to a level sufficient to support the construction of a lumber mill and coal and wood yard that occupied the Property during the 1880s.  (Affidavit of David F. Hurley, September 10, 2012, Exh. B at ¶15; AEI 2003 Request for Widespread Polluted Fill Variance, Exh. 5 at 1-4, 13, & 15-16 [UI002107-2110, UI002119, UI002121-2122]; GEI Phase I ESA Report, Pls. Exh. 9 at P000093, 101).  The New Haven Electric Company purchased the Property in 1890 and constructed and operated a power plant on the north end of the Property (referred to as "Station B" on Parcel A) until approximately 1903.  Between the years of 1872 and 1940, the river was dredged by the U.S. Army Corps of Engineers (or its predecessor) to support shipping and changes in the U.S. Harbor Lines.  Available information suggests that the dredge spoils were disposed of by extending the island.  This information also indicates that those dredge spoils are expected to have contained coal tar products and contamination from surrounding industrial operations.  (AEI 2003 Request for Widespread Polluted Fill Variance, Exh. 5 at 1-9 [UI002107-2115]).  For certain of these dredge spoils, this contamination could have included

PCBs from surrounding industrial operations, PCBs having been in commercial use as of the late 1920's. (Affidavit of David F. Hurley, September 10, 2012, Exh. B at ¶15).

2. _Investigation and Remediation by UI_: UI's investigation of and remedial action at the Property prior to the transfer to QE in 2000 included at least the following:

> ➤ Chemical and petroleum wastes were removed in 1992, including 13,315 pounds and 966 gallons of hazardous waste that were shipped off-site in 1992 as a "result of placing the power generating plant on deactivated reserve status and eliminating on-site hazardous materials." (GEI Phase I ESA Report, Pls.' Exh. 9 at P000094, 101, 109, 114, 117, 119).

> ➤ The removal of 324 tons of PCB-impacted soil along the western bulkhead (Area of Concern ("AOC") 5) beginning in June 1998. (UI 1998 Subsurface Investigation and Remediation Plan Report for English Station, Exh. 1 [UI000859]).

Throughout its ownership of the Property, UI was proactive in addressing environmental matters as they arose or might arise. As documented in GEI's Phase I Environmental Site Assessment, UI complied with CT DEEP reporting requirements and promptly responded to spills of hazardous materials. (See Pls.' Exh. 7 and materials attached thereto; Pls.' Exh. 9 at P000110.) A 1998 report summarizes remedial activities and post-remediation sampling in connection with the action taken by UI in response to the spill discovered during the bulkhead repair. (See UI 1998 Subsurface Investigation and Remediation Report, Exh. 1). No reference to any other releases is made in GEI's Phase I Environmental Site Assessment. (See Pls.' Exh. 9 at P0000110).

As part of its operations and independent of any remediation, during its ownership of the Property, UI made determinations as to storage and disposal of PCBs or PCB-contaminated electrical equipment on an on-going basis, using UI's standard operating procedures. (AEI 2002 Site-wide PCB Characterization and Cleanup Plan at 9, 10, Exh. 12 [UI001236-1237]). As indicated above, any PCB-contaminated equipment stored on the Property was removed by UI

prior to the transfer of the Property to QE. (See Affidavit of Bohdan Katreczko, September 10, 2012, Exh. A at ¶15; AEI 2002 Site-Wide PCB Characterization and Cleanup Plan, Exh. 12 at 9, 10, 20 and 26 [UI001236-1237, UI001248, UI001254). As Advanced Environmental Interface, Inc. ("AEI") observed in 2002, "UI has removed from the site all PCB and PCB-contaminated electrical equipment that was non-functional or is not required for plant restart. Other equipment remaining onsite is operational and necessary and QE does not plan to remove it." (Id. at 9 [UI001236]). The Environmental Condition Assessment Form ("ECAF") prepared on behalf of QE and submitted with the Form III filed by QE under the Property Transfer Act Program states that, although "[t]hirteen potential release areas were identified on the [Property,]" "all have been investigated and several have either been remediated or determined to require no further action." (Environmental Condition Assessment Form dated September 1, 2000, Exh. 29 at 3 [UI001176]). Any equipment potentially containing or contaminated with PCBs which remained on the Property was equipment that was operational and viewed by QE as being necessary for restarting power generating operations at the Property. (Affidavit of Bohdan Katreczko, September 10, 2012, Exh. A at ¶9; Affidavit of David F. Hurley, September 10, 2012, Exh. B at ¶15). And, in addition, all potential release areas at the Property had been investigated by UI and, for several of those areas, UI had conducted remedial action, or a determination had been made that no further action was required. (ECAF dated September 1, 2000, Exh. 29 at 3 [UI001176]).

3.  *Investigation and Remediation by QE:* As set forth above, QE agreed to undertake all environmental obligations related to the Property upon transfer. QE retained AEI to conduct any further investigation and remediation work required to bring the Property into

compliance with standards and guidelines, including the RSRs.  Remedial work performed by

AEI is summarized briefly as follows:

> 2003 – PCB soil and concrete were cleaned up in accordance with the site-wide PCB plan requested by EPA and DEP as of January 2003 and a concrete floor was placed over the former earthen portions of the Station B basement on Parcel A to render metals and PAH-impacted soils inaccessible (AEI 2003 Request for Widespread Polluted Fill Variance, Exh. 5 at 11, 21 [UI002117, UI002127]; AEI 2007 Parcel A PCB Cleanup Plan, Exh. 7 at 11 [UI003896]).

> 2005 – Parcel A was determined by AEI to be suitable for general industrial use under the PCB regulations. As of March 2005, the Station B building had been remediated to less than 1 ppm in pervious surfaces and less than 10 ppm on stained impervious surfaces. Remediation of the yard area (including a cap) and the recording of an ELUR were planned. (AEI 2005 Interim Station B PCB Report, Exh. 6 at 3, 6 [UI002750, UI002753])

> 2007 – In a cleanup plan for Parcel A prepared after Plaintiffs' acquisition of the Property, AEI states that the prospective power plant developer will accept a deed restriction and will commit to maintaining the cap.  Any >1 ppm PCB soil would be located either under the new power plant or under a cap.  It was also intended that QE would sign a written certification as the party responsible for the cleanup.  (AEI 2007 Parcel A PCB Cleanup Plan, Exh. 7 at 15, 18 [UI003900, UI003903]).  Remediation of soil at Parcel A in accordance with the 2007 cleanup plan commenced in November 2007.  (AEI 2008 Interim Parcel A PCB Cleanup Status Report, Exh. 8 at 1 [UI00005152]).

> 2008 – By May 2008, PCB remediation of Parcel A was completed in accordance with the EPA-approved cleanup plan with the exception of capping an area north of Track A where PCBs greater than 1 mg/kg and less than 10 mg/kg remained and the characterization and removal of sediment in the discharge tunnel. All generated remediation wastes were removed from the Property. (AEI 2008 Interim Parcel A PCB Cleanup Status Report, Exh. 8 [UI005152-5171]).

After 2000 and even following the transfer of Parcel A to Evergreen Power and Parcel B

to Asnat in 2006, QE and AEI engaged in further investigation activities and carried out

additional remedial work at the Property.

### C.     Activities at the Property by Plaintiffs and Others Resulting in Releases

In addition to the activities of QE as it operated at the Property, which included

engineering and maintenance work in preparation for restarting power generating operations at

the Property (see Pls.' Exh. 7) and metal scrapping and recycling activities at the Property (see AEI Actions Taken in Response to Significant Environmental Hazard Letter, April 25, 2005, Exh. 15. at 1 [UI00003162]; Affidavit of David F. Hurley, September 10, 2012, Exh. B at ¶¶15 and 18), during at least their period of tenancy at and ownership of the Property, Plaintiffs operated and engaged in activities at the Property as well, some of which resulted in the CT DEEP and EPA Enforcement Actions.

On September 23, 2011, EPA filed an administrative complaint under the Toxic Substances Control Act (TSCA) against Plaintiffs alleging violations of TSCA and the mishandling and mislabeling of certain PCB-contaminated oils that Plaintiffs removed from electrical equipment at the Property on or about January 19, 2011. EPA's claimed violations of TSCA include omissions and inaccuracies on waste manifests and failure by Plaintiffs to notify EPA about their PCB waste generation activities. EPA is seeking civil penalties. (See EPA TSCA Complaint, Exh. 14).

On February 8, 2012, CT DEEP issued a Cease and Desist Order to Plaintiffs and others associated with Plaintiffs, including Grant Mackay Demolition Company, Plaintiffs' agent. (DEEP 2012 Cease and Desist Order, Exh. 3). CT DEEP ordered the Respondents to cease demolition activities at the Property until CT DEEP and EPA were satisfied that contamination existing at the Property was properly characterized and remediated. (Id.). Specifically, CT DEEP alleges that PCBs and/or the tracking of PCBs had resulted from the salvage, scrapping and demolition activities being performed at the Property in 2011, including the tracking of PCBs out of the vicinity of PCB or PCB-containing equipment or materials, and the movement of PCB-containing equipment around the Property. (Id. at ¶34; GeoQuest 2012 Revised Short Term Work Plan, Ex. 2 at 1[UI005302]).

-13-

Thus, CT DEEP and EPA became involved with Plaintiffs and the Property as a result of the Plaintiffs' failure to properly manifest PCB-contaminated waste transformer oil Plaintiffs generated during the course of Plaintiffs' salvage, recycling and scrapping activities. According to the governmental authorities, Plaintiffs failed to comply with 40 CFR 761.207(a) and to notify EPA of PCB waste storage, disposal, and transportation activities in accordance with 40 CFR 761.205(a)(2). Plaintiffs' salvage, scrapping and demolition activities resulted in releases long after UI's transfer of the Property to QE in 2000. (EPA TSCA 2011 Complaint, Exh. 14; CT DEEP Cease and Desist Order, Exh. 3; GeoQuest 2012 PCB Self-Implementing Plan, Ex. 25; DEEP 2012 Disapproval Letter for Short Term Work Plan, Exh. 26; GeoQuest 2012 Revised Short Term Work Plan, Exh. 2).

## II.    ARGUMENT

### A.    The Summary Judgment Standard

For purposes of summary judgment, "the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). If the moving party meets its burden, the nonmoving party must "set forth facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). "Allegations that proffer legal conclusions . . . but are not buttressed with factual support expressed in [an] affidavit may not serve as the basis for supporting or opposing a motion for summary judgment." Pagliuco v. City of Bridgeport, No. 3:01-CV-836, 2005 U.S. Dist. LEXIS 33738, *23 (D. Conn. Dec. 13, 2005) (Garfinkel, M.J.) (citations and internal quotation marks omitted). "In assessing the record, the trial court must resolve all ambiguities and draw all

inferences in favor of the party against whom summary judgment is sought." Greystone Cmty. Reinvestment Ass'n v. Berean Capital, Inc., 638 F. Supp. 2d 278, 286 (D. Conn. 2008) (citing Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38). Evidence favorable to the moving party "must be disregarded unless a reasonable jury would have to credit it because it comes from a disinterested source and is uncontradicted and unimpeached." Id. (citation omitted). Summary judgment should be granted only when "no rational finder of fact could find in favor of the non-moving party." Id. (quoting Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000)). If reasonable people could disagree as to the outcome, summary judgment is improper. Id.

**B. There are One or More Genuine Issues of Material Fact in Dispute and, Therefore, Plaintiffs are not Entitled to Summary Judgment on the First Count of Their Second Amended Complaint.**

To establish a prima facie case of liability under Section 107(a) of CERCLA, a private party plaintiff must prove all four of the following elements: "(1) the site is a 'facility' as defined in CERCLA, (2) a release or threatened release of a hazardous substance has occurred, (3) the release or threatened release has caused the plaintiff to incur response costs that were necessary and consistent with the National Contingency Plan set up by CERCLA, and (4) the defendants fall within one or more of the four classes of responsible persons described in CERCLA § 107(a)." Freeman v. Glaxo Wellcome, Inc., 189 F.3d 160, 163 (2d Cir. 1999). Plaintiffs have failed to meet their burden to demonstrate these elements and, therefore, their Motion must be denied.

UI further maintains that Plaintiffs have failed to establish the admissibility of the expert testimony it appears they are seeking to offer in their Affidavits for purposes of demonstrating a prima facie case under § 107(a). An admissible expert opinion, whether based on scientific or other specialized knowledge, must be both (1) relevant, *i.e.*, probative of a factual issue, and (2)

reliable, *i.e.*, "based upon sufficient facts or data" and the product of reliable principles and methods that have been applied to the facts of the case.  See Fed. R. Evid. 702;  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93, 597 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).  Pursuant to Rule 702, in order to testify to *scientific knowledge*, the expert's opinion must be based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation"; the expert must have "good grounds" for his or her belief.  Daubert, 509 U.S. at 589 (1993).

Plaintiffs have not yet disclosed their experts.  Nonetheless, Plaintiffs' Motion for Partial Summary Judgment relies heavily upon certain affidavits in which Plaintiffs appear to proffer expert testimony to establish undisputed facts essential to their presentation of a prima facie case under the First and Fourth Counts of the Second Amended Complaint.  In this Memorandum in Opposition and contrary to statements in these affidavits, UI identifies genuine issues in dispute with respect to these purportedly undisputed facts.  Furthermore, Plaintiffs' affidavits lack adequate foundation for many of the conclusory statements set forth and fail to meet the requirements of relevance and reliability.  These affidavits rather represent Plaintiff's *ad hoc* effort to transform conjecture and speculation into expert testimony.  There is no basis provided upon which to conclude that the affiants undertook an independent and complete investigation of the facts or information.

The Affidavits of Timothy N. Wasielewski of Advanced Environmental Interface, Inc. and Marc I. Casslar of GeoQuest, Inc. (Pls.' Exh. 7; Pls.' Exh. 8), in particular, are self-serving and incomplete.  Other than citation to his own summary of May 11, 2012, wherein he states he reviewed "certain information on file at AEI" and information "obtained during the time period AEI was retained by Quinnipiac Energy LLC", Mr. Wasielewski makes no reference to a review

of any more recent information.  (Pls.' Exh. 7 at ¶7; Pls.' Exh. 6 at 1).  His May 11, 2012

summary is rife with references to what is "presumed", "potential" and "possible".  (Pls.' Exh. 6

at 2-3).  And, of note, at page 5 of his May 11, 2012 Report, Mr. Wasielewski acknowledges that

"AEI was not authorized to conduct any investigations to assess the presence or extent of PCB

impacts inside English Station."  (Id. at 5).  He further states that AEI was not authorized to

research or investigate "PCB-impacted sediment in the Mill River East Branch and Mill River

West Branch."  (Id. at 4-5).

　　　　Likewise, there are significant concerns with the Affidavit of Marc I. Casslar.  (Pls.' Exh.

8).  The primary purpose of this Affidavit appears to be to assist Plaintiffs with their required

demonstration that they have incurred recoverable response costs in connection with actions that

were necessary and consistent with the National Contingency Plan.  Conspicuously absent from

Mr. Casslar's recitation of his interaction with CT DEEP and EPA is any reference to the non-

CERCLA enforcement actions against Plaintiffs which occasioned this interaction and, upon

information and belief, are still pending; his Affidavit instead carefully refers to "issues

associated with the removal and disposal of PCB-containing oil and equipment at this site. . . ."

(Pls.' Exh. 8 at ¶19).  It is noteworthy that these enforcement actions arose out of activities at the

Property which, upon information and belief, involved Mr. Casslar.  Further, to the extent Mr.

Casslar's reference to "abandoned equipment" in Paragraphs 14 and 16 of his Affidavit is

intending to leave the reader with the impression that equipment was "abandoned" by UI, there is

no foundation provided for these statements which are squarely contradicted by the evidence,

including reports cited by Plaintiffs.  (Pls.' Exh. 8 at ¶¶14, 16).

　　　　The Affidavit of John J. Insall of Stantec Consulting Services, Inc., like Mr. Casslar's

Affidavit, refers to "consultation" with EPA and CT DEEP and also fails to note the fact of the

pending non-CERCLA enforcement actions against Plaintiffs. (Pls.' Exh. 3 ¶11). This Affidavit

is another unsuccessful attempt by Plaintiffs to demonstrate that it is undisputed that Plaintiffs

have incurred recoverable response costs in connection with actions that were necessary and

consistent with the National Contingency Plan. Further, to the extent Paragraph 9 of Mr.

Insall's Affidavit is intended to state that there never was "a site-wide plan for remediation",

there is no foundation provided for this statement which is also contradicted by the evidence; it is

undisputed, for example, that prior to and in connection with the 2000 transfer of the Property by

UI to QE, GEI prepared a site-wide Remedial Action Plan. (Id. at ¶9). The Professional

Services Agreement dated June 20, 2012, between Stantec and Asnat (and not Evergreen Power),

states that a "site-wide Conceptual Remedial Action Plan (C-RAP) based on the existing data

provided by [Asnat]" will be completed within "approximately 45 days"; UI is not aware of any

C-RAP being completed.

    Particularly at this stage in this action, when discovery has not even commenced, UI

challenges the admissibility of their "expert" Affidavits.

**1. There is a Genuine Issue Of Material Fact in Dispute as to Whether There is a Release or Threatened Release that Occurred when Defendant Was the Owner and Operator of the Property.**

    Included among the categories of responsible parties under CERCLA is "any person who

at the time of *disposal* of any hazardous substance owned or operated any facility at which such

hazardous substances were disposed of." 42 U.S.C. 9602(a) (2) (emphasis added.) "Disposal" is

defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid

waste or hazardous waste into or on any land or water so that such solid waste or hazardous

waste or any constituent thereof may enter the environment or be emitted into the air or

discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). A prima facie case

for a Section 107(a) private party cost recovery action requires proof of not just the presence at some time of a hazardous substance at a site, but rather a demonstration that there has been a release of a hazardous material and that the release occurred when the defendant owned or operated the site.

In seeking summary judgment under their First Count, Plaintiffs argue that they have incurred costs in responding to the release of hazardous substances at the Property and that these costs are recoverable from UI. (Pls.' Mot. at 9). Plaintiffs further make a summary assertion that there is no dispute that UI was the owner and operator of the Property during the disposal or release of these hazardous substances and that Plaintiffs have, therefore, satisfied the second and fourth elements of a Section 107(a) private party cost recovery action. (Pls.' Mot. at 6-8). To support their assertion, Plaintiffs argue that UI has admitted that hazardous substances were disposed of at or on the Property prior to the transfer of the Property to QE in 2000 and that there is no genuine issue disputing their claimed fact that all PCBs, both removed and currently located on the Property, were introduced to the Property during UI's ownership. (Id. at 7.)

There are, however, genuine issues of material fact that are in dispute and, depending upon the outcome of this dispute, the ultimate determination as to these issues contradicts the facts as they are asserted by Plaintiffs. Simply saying it is so does not establish the existence of a fact. Contrary to Plaintiffs' blanket and unsubstantiated assertions and even assuming that there were costs incurred and these costs are otherwise recoverable response costs, which is a significant additional material fact in dispute, Plaintiffs have not demonstrated that they have incurred their claimed costs during the course of and in connection with responding to releases or threatened releases in a location where there had been a disposal of hazardous substances by UI. While Plaintiffs' burden for purposes of their Motion may not require a demonstration of a strict

causal relationship characteristic of traditional tort actions between the costs they claim they have incurred in cleaning up their Property and any hazardous substances that may have been disposed of by UI, Plaintiffs must establish that they have incurred response costs where in fact UI disposed of hazardous substances during UI's ownership and operation. Plaintiffs' sweeping statements do not meet this clear burden. See Niagara Mohawk Power Corporation v. Chevron U.S.A., 596 F.3d 112, 133 (2d Cir. 2010) ("NiMo has taken no remedial action and incurred no cost to investigate or cleanup Area 3…. It would seem that in order for NiMo to recover costs, NiMo must prove first that it incurred them.") (citation omitted). As discussed supra, there is information that supports the conclusion that any disposal being addressed by Plaintiffs' claimed costs occurred during a period other than that when UI owned the Property. This information includes the allegations of the CT DEEP and EPA Enforcement Actions relating to Plaintiffs' generation and improper handling of waste transformer oil at the Property. (Affidavit of David F. Hurley, September 10, 2012, Exh. B at ¶¶8, 13, 15-18).

The Property consists of two parcels and there is a long and detailed history of investigation of these parcels. (Affidavit of David F. Hurley, September 10, 2012, Exh. B ¶¶6, 14).See Innis Ardin Golf Club, v. Pitney Bowes, Inc., 629 F. Supp. 2d 175, 191 (D. Conn. 2009) (citing 42 U.S.C. § 9607(a)(4) and B.F. Goodrich v. Betkoski, 99 F.3d 505, 514 (2d Cir. 1996). A plaintiff must provide evidence linking its claimed response costs to a location where there was a release caused by the defendant, which Plaintiffs' broad brush approach in their Motion has failed to do  See, e.g., White v. County of Newberry, 985 F.2d 168, 174-75 (4th Cir. 1993) (requiring plaintiffs to prove "a release or threatened release of a hazardous substance from the County's maintenance facility that caused the Whites to incur response costs consistent with the national contingency plan"); Dedham Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453,

459-60 & n.3 (1st Cir. 1992) (affirming the district court's focus "on whether Cumberland somehow, or in some way, caused Dedham to incur response costs" and noting that "without an affirmative finding of fact causally connecting these costs to a threat posed by [Dedham], [Cumberland's CERCLA] claim is necessarily stillborn"); Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 670 (5th Cir. 1989) ("[T]he question of whether a release has caused the incurrence of response costs should rest upon a factual inquiry into the circumstances of a case and the relevant factual inquiry should focus on whether the particular hazard justified any response actions.")). Here, in fact, there is evidence that Plaintiffs' activities and the activities of those with whom they have had a contractual relationship may have caused a release or releases from Parcel B (English Station) onto Parcel A.   (See Affidavit of David F. Hurley, September 10, 2012, Exh. B at ¶18.; CT DEEP Cease and Desist Order ¶ 34, Exh. 3 [UI005175]; GeoQuest Revised Short-Term Work Plan English Station, 1, 10-12 Exh. 2 (2012) [UI005302, UI005311] ("A Cease and Desist Order (CDOWSUST 12-001) (Order) was issued by the CTDEEP… due to concerns about potential exposure to PCBs and/or the 'tracking' of PCBs resulting from the [recycling] work being performed at the [Property].")).

Simply stated, there are genuine issues of material fact in dispute, since Plaintiffs have failed to connect the dots between the *disposal* of any hazardous substance during the time that UI owned the Property (including the location of any claimed disposal by UI and in particular the disposal of any hazardous substance during the time that UI owned the Property that has not since been remediated) and the response costs Plaintiffs claim they have incurred and are entitled to recover under the First Count of their Second Amended Complaint.

Plaintiffs have not met their burden of proof to establish the second and fourth elements of a Section 107(a) private party cost recovery action. There are genuine issues of material fact in dispute with respect to each of these elements.

**2.      There are Genuine Issues of Material Fact in Dispute as to Whether Plaintiffs' Costs Were Response Costs and Were Incurred in Connection with Actions that Were Necessary and Consistent with the National Contingency Plan.**

Plaintiffs must also prove the third element of a Section 107(a) private party cost recovery action. Plaintiffs must demonstrate that there is no genuine issues of material fact in dispute regarding Plaintiffs' proof that "the release or threatened release [of hazardous substances] has caused the plaintiff to incur response costs that were necessary and consistent with the National Contingency Plan set up by CERCLA . . . ." <u>Freeman</u>,189 F.3d at 163.

Plaintiffs'summary assertion that EPA and CT DEEP involvement at the Property in the context of the pending non-CERCLA CT DEEP and EPA Enforcement Actions is sufficient to establish that the claimed costs were in fact response costs and that these claimed response costs were necessary and substantially consistent with the NCP is disingenuous and, in any event, in error and thus inadequate to make a prima facie case. (Pls.' Mot. at 12-13). Inexplicably, Plaintiffs' memorandum, including the affidavits upon which this memorandum relies, fails to make any reference to the CT DEEP and EPA Enforcement Actions. With this failed attempt to gloss over another essential element of a Section 107(a) private party cost recovery action, Plaintiffs yet again do not meet their burden to present a prima facie case.

Plaintiffs have failed to demonstrate that their claimed costs are response costs recoverable under Section 107(a). The invoices Plaintiffs have submitted with their Motion do not identify with any specificity the activities that were undertaken and the linkage of these activities to any release or disposal of a hazardous substance is completely lacking. In fact, most

of the costs reflected on the invoices appear to be either in the nature of building material assessment activity or relating to Plaintiffs' dealing with the CT DEEP and EPA Enforcement Actions. (Affidavit of David F. Hurley, September 10, 2012, Exh. B ¶9). Only two of the invoices, totaling $2,145.50 and both in late 2009, even reference the NCP. However, it is not possible from the little information provided on these two invoices to conclude that the services were in fact response costs, necessary and consistent with the NCP. (Id.) Of note, the majority of the invoices are addressed to an entity named "Community Retail" and not either of the Plaintiffs. Any invoices not addressed to Community Retail are addressed to Asnat, not Evergreen Power. (Id. at ¶ 9).

To succeed in a Section 107(a) private party cost recovery action, Plaintiffs must show that their actions and the costs associated with those actions were consistent with the NCP as set forth at 40 C.F.R. § 300.700. Niagara Mohawk Power Corporation v. Chevron, U.S.A., Inc., 596 F.3d 112, 137 (2d Cir. 2010) ("Courts presume that actions undertaken by the federal, or a state, government are consistent with the [NCP]. However, private parties that have responded to hazardous substances must establish compliance. One way of establishing compliance with the national contingency plan is to conduct a response under the monitoring, and with the ultimate approval, of the state's environmental agency." (citation omitted); K.V.L. Corp. v. Holson Co., No. 5:91CV59(AWT), 2000 U.S. Dist. LEXIS 22955, at *116-17, *122-123 (D. Conn. Aug. 3, 2000) ("As [plaintiff] did not provide an opportunity for public comment and participation in its selected remedy, and this goal of the NCP was not satisfied in some other way, and further because steps taken by [plaintiff] with respect to a baseline risk assessment and a study of remedial alternatives did not constitute an approach comparable to that contemplated by the NCP's provisions as to the [feasibility study], the court concludes that each of these deviations

by [plaintiff] from the NCP was a material and substantial deviation, and accordingly, that [plaintiff's] response action evaluated as a whole was not consistent with the NCP. Therefore, [plaintiff] cannot recover under CERCLA."). Section 300.430(f)(3) of the NCP more fully explains that the NCP requires that a brief analysis of the proposed plan be published in a major newspaper, that not less than thirty days be allowed for the submission of written and oral comments from the public, and that a public meeting be held during the comment period at or near the proposed cleanup site.

Plaintiffs have not produced any evidence that they solicited or entertained public comment regarding their claimed remediation efforts. This failure to provide an opportunity for public comments and participation in the selection of a remedy alone supports the conclusion that Plaintiffs' actions were not consistent with the NCP. See K.V.L. Corp., 2000 U.S. Dist. LEXIS 22955, at *122. See also Public Serv. Co. of Colorado v. Gates Rubber, Co., 22 F. Supp. 2d 1180, 1194 (D. Colo. 1997) ("It is the conjunction of [plaintiff's] insufficient remedial investigation/feasibility study and its meager attempt to fulfill the public comment requirement which makes [plaintiff] unable to substantially comply with the NCP as a whole."); see also, Pierson Sand & Gravel, Inc. . Pierson Township, 1996 U.S. App. LEXIS 16088, *15 (6th Cir. 1996) ("While governmental supervision of a cleanup may provide some of the guarantees as a cleanup subject to public comment and criticism, the NCP does not allow this type of substitution. 'Public comment means just that, public comment. Negotiation between [a plaintiff] and [the state agency] do not constitute the public comment contemplated by CERCLA regulations.'") (citation omitted). In fact, courts have barred plaintiffs from seeking cost recovery where there has not been public notice and comment. See, e.g., Carson Harbor Vill., Ltd. v. County of L.A., 433 F.3d 1260, 1269 (9th Cir. 2006) (barring cost recovery for failure to

provide an opportunity for public comment on the response action); County Line Inv. Co. v. Tinney, 933 F.2d 1508, 1514-1515 (10th Cir.1991) (same).

Plaintiffs have also not produced any evidence that any activities they claim they have conducted at the Property were monitored, let alone approved, by CT DEEP or EPA. Niagara Mohawk Power Co., 596 F3d. at 137. In fact, CT DEEP actually issued a disapproval of a short term plan Plaintiffs submitted and there is no indication to date of any plan approval. (Affidavit of David F. Hurley, September 10, 2012, Exh. B ¶ 10; Disapproval Letter from CT DEEP to Asnat Realty, LLC, Evergreen Power, LLC, and Grant MacKay Demolition Company (March 1, 2012), Exh. 26 [UI005294-5298]). Plaintiffs rely on N.Y State Elec. & Gas Corp. v. FirstEnergy Corp., 808 F. Supp. 2d 417, 522 (N.D.N.Y. 2011) and Pfohl Bros. Landfill Site Steering Comm. v. Browning-Ferris Indus. of N.Y., Inc., No. 95CV956A(F), 2004 U.S. Dist. LEXIS 28367, at *22 (W.D.N.Y. 2004) for the proposition that NCP consistency can be established upon a showing of state agency or EPA involvement. (Pls.' Mot. at 12). Plaintiffs' reliance on these cases is misguided. As an initial matter, the proposition that agency involvement in remedial actions establishes consistency with the NCP is not a rule followed in every jurisdiction. See Sherwin-Williams Co. v. City of Hamtramck, 840 F. Supp. 470, 477 (E.D. Mich. 1993) ("[S]tate regulatory involvement in the remedial process is not a substitute for the public comment contemplated by section 300.700(c)(6). Public comment means just that, public comment. Negotiations between the City and [Michigan Department of Natural Resources] officials do not constitute the public comment contemplated by the CERCLA regulations."). The cases Plaintiffs cite make clear that for state agency or EPA involvement to establish consistency with the NCP, the governmental authority must approve the cleanup plan and monitor the remediation process, and the response work must be performed in accordance with agency requirements. See N.Y

State Elec. & Gas Corp., 808 F. Supp. 2d at 522 ("Among the ways in which NCP consistency can be established is through a showing that a state environmental agency has approved of a cleanup plan and monitored the remediation process, and the response work is performed in accordance with the agency's requirements."); Pfohl Bros. Landfill Site Steering Comm., 2004 U.S. Dist. LEXIS 28367, at *73 ("[W]here a CERCLA response action involves a state environmental agency charged with approving cleanup plans and monitoring the remediation process, the NCP consistency requirement is satisfied.").  In N.Y State Elec. & Gas Corp., the court found that all of the plaintiff's actions were taken at the direction and/or with approval of the New York State Department of Environmental Conservation.  N.Y State Elec. & Gas Corp., 808 F. Supp. 2d at 522.

One of the affidavits provided by Plaintiffs is the Affidavit of Marc I. Casslar, which cites to there being "numerous requests" from EPA and/or CT DEEP and "associated discussions" with EPA and/or CT DEEP regarding the identification and analysis of PCB-containing equipment, the removal and proper disposal of PCB-containing oil, and the identification of PCB-containing oil.  (Pls.' Exh. 8 ¶¶13, 19).  Absent from this affidavit is any reference to the CT DEEP and EPA Enforcement Actions.  A second affidavit simply states that Plaintiffs have hired an individual to consult with EPA and CT DEEP on behalf of Plaintiffs regarding the development of a draft "conceptual" remedial action plan.  (Pls. Exh. 3 ¶¶11-12).  As stated above, Plaintiffs do not assert, and do not provide any evidence which establishes let alone even suggests, that either EPA or CT DEEP has approved any cleanup plan or monitored any remediation process, or that Plaintiffs have performed response work in accordance with any specific regulatory requirements.

EPA's involvement with Plaintiffs in 2011 and 2012 was triggered by Plaintiffs' violations of TSCA as discussed <u>supra.</u> CT DEEP's involvement in February 2012 was in the form of a Cease and Desist Order. This serious and summary action was taken because of CT DEEP's concerns specific to Plaintiffs' TSCA violations as alleged by EPA and the recycling, scrapping, salvage and demolition activities being engaged in at the Property by Plaintiffs and others associated with Plaintiffs. (Affidavit of David F. Hurley, September 10, 2012, Exh. B at ¶¶8, 18; CT DEEP Cease and Desist Order (2012), Exh. 3 at ¶ B.1 [UI005172-UI005182]). To the best of UI's knowledge, this Cease and Desist Order remains in effect today. This is clearly not the type of "agency involvement" discussed in or contemplated by case law finding satisfaction of the requirement for NCP when NCP consistency has not otherwise been proven. Here, agency involvement is a direct consequence of Plaintiffs' own acts and omissions, i.e., their mishandling and mismanagement of waste transformer oil they alone generated.[1]

As discussed above, there are genuine issues of material fact in dispute as to why Plaintiffs incurred the costs they are claiming as recoverable response costs. There may be an additional reason why Plaintiffs' costs are not recoverable response costs, if they were incurred when furthering Plaintiffs' plan to redevelop the Property, not to protect the environment or public health. <u>See</u> <u>Sealy Con. Inc. v. Litton Indus.</u>, 93 F. Supp. 2d 177, 188-189 (D. Conn. 2000). In <u>Sealy</u>, the court held that a plaintiff in a cost recovery action cannot use CERCLA to pay for improvements to its property. <u>Id.</u>; <u>see also</u> <u>Waste Management of Alameda County, Inc. v. East Bay Regional Park District</u>, 135 F. Supp. 2d 1071, 1104 n.34 (N.D. Cal. 2001) ("This

---

[1] EPA and DEEP "involvement" raises a genuine issue as to whether Plaintiffs' actions addressing the agencies' "involvement" are even voluntary. <u>See</u> <u>Morrison Enterprises, LLC v. Dravo Corporation</u>, 638 F.3d 594, 604 (8th Cir. 2011) (holding that because plaintiffs had not "voluntarily" incurred response costs, their remedy was necessarily one for contribution, under Section 113 of CERCLA).

expense, however, is not a recoverable cost under CERCLA because the Park District's bay mud program was not intended as a response action, but a park development project.").

Plaintiffs have failed to demonstrate that their claimed costs were response costs and that, even if they were response costs, they were necessary and are consistent with the NCP. There are genuine issues of material fact in dispute with respect to this element of a Section 107(a) private party cost recovery action.

3. **There are Genuine Issues of Material Fact in Dispute Relevant to Whether the Plaintiffs' Action to Recover Costs under Section 107(a) is Barred by the Statute of Limitations.**

The First Count of Plaintiffs' Second Amended Complaint seeks to recover remedial costs under Section 107(a) of CERCLA. UI submits that this private party cost recovery action is time barred because it was filed more than six (6) years after the commencement of remedial action at the Property. See 42 U.S.C. § 9613(g)(2)(B). An initial action for recovery of costs incurred for remedial action must be commenced "within 6 years after initiation of physical on-site construction of the remedial action . . . ." The phrase "physical on-site construction" is interpreted broadly to include any activities that constitute part of the remedy. See Schaefer v. Town of Victor, 457 F.3d 188, 203-04, 207 (2d Cir. 2006).

A "remedial action" is defined by statute as:

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking

containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(24). "CERCLA distinguishes between two kinds of response: remedial actions -- generally long-term or permanent containment or disposal programs -- and removal efforts -- typically short-term cleanup arrangements." Schaefer, 457 F.3d at 195 (internal quotation marks omitted.). "Because of the different limitations periods and triggers, whether an activity is a 'removal action' or a 'remedial action' under [CERCLA] *§ 107(a)* can be determinative of the timeliness of a claim." Yankee Gas Services Co. v. UGI Utilities, Inc., 616 F. Supp. 2d 228, 269 (D. Conn. 2009).

Plaintiffs do not address 42 U.S.C. § 9613(g)(2)(B) in their Motion for Partial Summary Judgment, but they do acknowledge that removal and remedial activities were performed at the Property prior to Plaintiffs' acquisition of the Property in December 2006. (Pls.' Mot. at 10). As reviewed in Section I.B., supra, and the attached Affidavit of David F. Hurley of Fuss & O'Neill, Inc., UI and QE undertook physical on-site construction of remedial action targeting releases of hazardous substances at the Property more than six (6) years prior to Plaintiffs' filing of this action on January 5, 2012. (Affidavit of David F. Hurley, September 10, 2012, Exh. B ¶¶14, 18). As reviewed in UI's 1998 Subsurface Investigation and Remediation Plan Report for English Station, as early as 1998, UI had commenced on-site construction of a remedial action at the

Property with the removal of 324 tons of PCB-impacted soil. (UI Subsurface Investigation and Remediation Plan Report (August 1998), Exh. 1 [UI000859]). By 2003, as reported by AEI, QE was remediating PCB soil and concrete in accordance with a site-wide PCB plan as requested by EPA and CT DEEP and placed a concrete floor over the former earthen portions of Parcel A's Station B basement, rendering metals and PAH impacted soils inaccessible. (Affidavit of David F. Hurley, September 10, 2012, Exh. B ¶14). If additional remedial work was or will be required in the areas of the Property previously remediated, the timing of the performance of such additional remedial work is irrelevant and the calculation of the statute of limitations for an initial cost recovery action will still be from the date of the initiation of physical on-site construction of the remedial action - in this case either 1998 or 2003. See United States v. Navistar Int'l Transp. Corp., 152 F.3d 702, 713 (7th Cir. 1998) ("Although it is true that the initial clay cap placed on the site was deemed inadequate to satisfy certain specifications required for the clay cap, we do not consider that fact relevant because the statute does not indicate that the initial construction must be successful.").

Plaintiffs do state that "[w]hile considerable Work was undertaken at the Property prior to plaintiffs' purchase, the parties conducting that Work did not address all areas of the Property and did not develop a site-wide plan for remediation." (Pls.' Mot. at 13). A site-wide remediation plan, however, is not necessary to trigger the statute of limitations under 42 U.S.C. § 9613(g)(2)(B) so long as the remedial action commenced is "consistent with a permanent remedy." See Schaefer, 457 F.3d at 207. And, in any event, UI and QE in fact did develop site-wide plans for remediation. (SeeAffidavit of David F. Hurley, September 10, 2012, Exh. B ¶ 14; GEI Consultants, Inc., Draft Remedial Action Plan English Station 2-4, 7 (2000), Exh. 4 [UI000948-0950, UI000953]; Advanced Environmental Interface, Inc., Site-Wide PCB

Characterization and Cleanup Plan Volume 1 English Station Site 2-3 (2002), Exh. 12 [UI001230-1232]). Since UI and/or QE initiated the physical on-site construction of a remedial action more than six years prior to when Plaintiffs filed this initial cost recovery claim, the time to assert this claim for Section 107(a) CERCLA response costs has run.[2]

Plaintiffs may argue that any prior actions by UI or QE are preliminary or removal actions and, therefore, that remediation of the Property triggering the six (6) year statute of limitations has not commenced. However, by Plaintiffs' own admission, the work completed at the Property includes "remediation." (Pls' Mot. at 3). Case law holds that there can only be one removal action and one remedial action per facility, regardless of the number of phases in which cleanup occurs. Yankee Gas Services Company, 616 F. Supp. 2d at 271 (citing Colorado v. Sunoco, Inc., 337 F.3d 1233, 1241 (10th Cir. 2003) and Kelly v. E.I. Dupont, 17 F.3d 836, 844 (6th Cir. 1994)). The one remedial action at the Property as defined by Plaintiffs commenced more than six (6) years prior to Plaintiffs' filing of the present action. (Pls.'s Mot. at 8.) Should Plaintiffs dispute that remedial action commenced and/or when it commenced at the Property,

---

[2] In Schaefer v. Town of Victor, the Second Circuit addressed the time bar to an action for recovery of removal action costs when the time for commencing a recovery action for remedial action costs has expired.

> CERCLA § 113(g)(2)(B) provides that an initial cost recovery action under § 107 must be commenced 'for a remedial action within 6 years after the initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action … [Thus, u]nder the plain language of the statute, because the 'cost recovery action brought under this subparagraph' is untimely, [plaintiff] cannot maintain a corresponding action for removal.

457 F.3d at 205, n.21. Since the statute of limitations has run on Plaintiffs' claim for remedial action cost recovery, even if Plaintiffs were to successfully argue that its costs were incurred in connection with removal actions, a claim for a removal action costs is also barred.

there is at a minimum a genuine issue of material fact in dispute and, therefore, Plaintiffs' Motion for Partial Summary Judgment must be denied.

Plaintiffs have been involved with the Property since at least 2005. Only now, seven (7) years later and after incurring costs because of governmental agency enforcement which is a consequence of the acts or omissions of Plaintiffs and others in a contractual relationship with them, do they commence this § 107(a) private party cost recovery action.

### C. Plaintiffs' Motion for Judgment under the Fourth Count of their Second Amended Complaint Must be Denied Because Plaintiffs have Failed to, and There is a Genuine Issue of Material Fact in Dispute as to Whether Plaintiffs can, Demonstrate Recoverable Response Costs under Section 107(a) of CERCLA.

In their Motion for Partial Summary Judgment, Plaintiffs also seek judgment as to the Fourth Count of the Second Amended Complaint. UI respectfully requests that this relief be denied.

Section 113(g)(2) of CERCLA governs a declaratory judgment in a CERCLA action. As private party cost recovery plaintiffs, Plaintiffs can only pursue the requested declaratory relief after they have successfully proven that they have incurred costs recoverable under Section 107(a). See City of Colton v. Am Promotional Events, Inc.-W., 614 F.3d 998, 1006-1007 (9th Cir. 2010). The Court does not have subject jurisdiction to address the question of the future liability of UI, which is the relief Plaintiffs appear to be seeking in their Fourth Count, unless and until Plaintiffs have established that each of them is entitled to cost recovery under their First Count. See Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc., 423 F.3d 90 (2d Cir. 2005). For the reasons set forth in Sections II.B. and II C. above, Plaintiffs have failed to demonstrate that they have incurred and can recover costs under Section 107(a) of CERCLA.

### III. CONCLUSION

There are genuine issues of material fact in dispute in this action and, accordingly, Plaintiffs' Motion for Partial Summary Judgment as to the First and Fourth Counts of their Second Amended Complaint must be denied. There are facts that support the dismissal of Plaintiffs' action to recover costs under Section 107(a) because it is barred by the statute of limitations applicable to such actions as set forth in 42 U.S.C. § 9613(g)(2)(B). As additional grounds for the Court's denial of, or in the alternative deferral of action on, Plaintiffs' Motion for Partial Summary Judgment, UI maintains that there are facts that are relevant and presently not available. There has been no discovery in this action. Plaintiffs' motion is premature and cannot be granted.

THE UNITED ILLUMINATING COMPANY

By:____/s/ Elizabeth C. Barton_____
     Elizabeth C. Barton (ct07660)
     René A. Ortega (ct26354)
     Day Pitney LLP
     242 Trumbull Street
     Hartford, CT 06103
     Telephone: (860) 275-0100
     Facsimile: (860) 275-0343
     E-mail:  ecbarton@daypitney.com
     E-mail:  raortega@daypitney.com

## UI EXHIBIT LIST

1. The United Illuminating Company, Subsurface Investigation and Remediation Plan Report (August 1998)

2. GeoQuest, Inc., Revised Short-Term Work Plan English Station (2012)

3. Connecticut Department of Energy and Environmental Protection, Cease and Desist Order (2012)

4. GEI Consultants, Inc., Draft Remedial Action Plan English Station (2000)

5. Advanced Environmental Interface, Inc., Quinnipiac Energy LLC Request for Widespread Polluted Fill Variance (2003)

6. Advanced Environmental Interface, Inc., Interim PCB Report for Station B Parcel Sale, English Station Site (2005)

7. Advanced Environmental Interface, Inc., QE English Station Parcel A PCB Cleanup Plan (2007)

8. Advanced Environmental Interface, Inc, Interim Status Report/Quinnipiac Energy English Station Parcel A PCB Cleanup Plan (2008)

9. Advanced Environmental Interface, Inc., QE English Station/Site Remediation Station B Parcel PCB Cleanup Plan QE English Station (2006)

10. Advanced Environmental Interface, Inc., Remedial Action Plan for Former Coal Yard Area English Station Site (2001)

11. Advanced Environmental Interface, Inc., QE English Station/Site Remediation Engineered Control Variance Request (2005)

12. Advanced Environmental Interface, Inc., Site-Wide PCB Characterization and Cleanup Plan Volume 1 English Station Site (2002)

13. Environmental Protection Agency, PCB Disposal Approval (2007)

14. Environmental Protection Agency, TSCA Complaint (2011)

15. Advanced Environmental Interface, Incl, Actions Taken in Response to Significant Environmental Hazard Letter (April 25, 2005)

16. Eastern Topographics, NO239-0928 CAM, April 15, 2001

17. Connecticut Department of Energy and Environmental Protection, photograph (2004).

18. Connecticut State Archives, (2000)

19. Pictometry, CTSTAT05046NeighOrtho6168_061229 (2006)

20. Google Earth (March 29, 2012)

21. Google Earth (September 10, 2010)

22. Connecticut Department of Energy and Environmental Protection, Application/Permit Transfer Approval Letter (August 15, 2000)

23. *In the Matter of Quinnipiac Energy, LLC*, Proposed Final Decision (Department of Environmental Protection 2002)

24. Plaintiffs' Answer to Environmental Protection Agency 2011 TSCA Complaint (2012)

25. GeoQuest, Inc., PCB Self Implementing Plan English Station (2012)

26. Disapproval Letter from Department of Energy and Environmental Protection to Asnat Realty, LLC, Evergreen Power, LLC and Grant MacKay Demolition Company (March 1, 2012)

27. Petition of the United Illuminating Company for Approval to Sell English Station, Final Decision (Department of Public Utility Control 2000)

28. Letter from Nicholas J. Harding to Linda Randell (July 9, 2008)

29. Department of Energy and Environmental Protection, Environmental Condition Assessment Form (September 1, 2000)

30. *In re: Quinnipiac Energy, LLC*, Final Decision (Department of Environmental Protection June 26, 2003)

31. Department of Energy and Environmental Protection, Emergency Incident Report (January 5, 2011)

32. Department of Energy and Environmental Protection, Emergency Incident Report (August 23, 2011)

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that on September 10, 2012, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone not registered to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

_____/s/ René A. Ortega_____
René A. Ortega
