# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| EVERGREEN POWER, LLC and<br>ASNAT REALTY, LLC | : CIVIL ACTION NO.<br>: 3:12-CV-00032 (SRU) |
| Plaintiffs,<br>v. | |
| UNITED ILLUMINATING<br>COMPANY | : SEPTEMBER 10, 2012 |
| Defendant. | |

## AFFIDAVIT OF BOHDAN KATRECZKO
## (UNITED ILLUMINATING COMPANY)

I, BOHDAN KATRECZKO, being duly sworn, deposes and says as follows:

1.  I am over the age of 18 and I believe in the obligations of an oath.

2.  I am employed by The United Illuminating Company ("UI") as Lead Analyst - Environmental. My responsibilities include: achieve environmental compliance by reviewing regulatory policies and obtaining the necessary permits, licenses, registrations, etc. for daily operations; clarify or interpret regulations, legislation, policies, conditions, and technologies affecting the business, including the reduction of exposure, liability, and costs. I have been employed by UI since April 30, 1984.

3.  The information stated herein is based on my personal knowledge and belief.

4.  Based on a review of property acquisition records maintained by UI, UI acquired the property at 510 Grand Avenue, New Haven, Connecticut, otherwise known as English Station, beginning in or about 1890 (the "Property").

5.  Station B, a former coal-fired plant located on the Property, ceased operation at the Property in approximately 1903.

6.　Subsequent to 1903, the Annex III location in Station B was used for the storage of equipment and waste oils; this use was discontinued during 1998.

7.　UI operated a power generating station at the Property from approximately 1929 until 1992, when active Units 7 and 8 at English Station were placed in deactivated reserve.

8.　When Units 7 and 8 were placed in deactivated reserve, steps were taken to protect the vital components from degradation over time so that, if and when needed, these units could be returned to service. To my knowledge, the dehumidification units on the vital components were continuously operated from their installation in 1992 until the time that UI transferred the Property to Quinnipiac Energy ("QE") in 2000. The humidity levels were maintained to the specifications set forth during that time. Between 1992 and UI's transfer of the Property, two UI operational personnel performed maintenance on the heating and cooling systems and undertook activities to preserve the equipment while the plant was in deactivated reserve. Daily rounds were made, which included inspections of oil-filled equipment to confirm there was no leakage. The vital components, therefore, were likely to be in the same condition in 2000, when UI transferred the Property to QE, as they were when the equipment was placed in deactivated reserve. From 1992 until the time of UI's transfer of the Property, the building was kept in good repair, weather-tight and heated in order to protect all other components. As of the transfer of the Property to QE in 2000, QE became responsible for any action required to restart Units 7 and 8 as well as the continued maintenance of those units in deactivated reserve.

9.　No PCB-containing equipment was abandoned at the Property at the time of the transfer to QE. Other than UI's transmission equipment that remained within the limited easement granted by QE to UI, only equipment desired by QE was left at the Property at the time of the transfer to QE.

10. Electric utility restructuring legislation in Connecticut in the 1990's required that each electric company, including UI, either fully divest or functionally separate its non-nuclear assets by no later than January 1, 2000.

11. In the June 9, 1999 Decision in Docket No. 98-10-07, <u>DPUC Review of The United Illuminating Company's Divestiture Plan – Phase II</u>, the Department of Public Utility Control ("DPUC") found that, with the decommissioning of the units, UI would satisfy the divestiture requirement with regard to English Station. At that time, the DPUC concluded that it was appropriate to retire English Station and that UI could recover the costs to decommission English Station.

12. UI actively marketed the Property, including portions thereof, to parties whom UI believed would have had an interest either for generation or for commercial or industrial purposes.

13. As a result of these marketing efforts, QE and UI negotiated terms whereby QE would acquire the Property.

14. QE purchased the Property for the stated purpose of restarting the units which had been in deactivated reserve since 1992.

15. At the time of the transfer of the Property to QE in 2000, not all equipment remaining at the Property contained polychlorinated biphenyls (PCBs) and any equipment containing PCBs that remained at the Property was in use and maintained by UI in compliance with state and federal regulations pertaining to such equipment; there was no release or threatened release from this equipment in 2000.

16. Authorized uses of PCBs, including certain PCB-contaminated equipment, which QE intended to continue to use post-transfer, remained on the Property at the time of UI's transfer to QE in 2000.

17. With the exception of UI's obligation to complete a bulkhead reconstruction project, QE agreed, to the express exclusion of UI, to undertake all environmental obligations related to the Property and to be the Certifying Party for purposes of the filing of a Form III as required by Connecticut's Property Transfer Act Program, Conn. Gen. Stat. §§ 22a-134, et seq. ("Property Transfer Act Program"). QE's obligations included a commitment to investigate and remediate all conditions existing at the Property at the time of the transfer in 2000 in accordance with prevailing standards and guidelines, including Connecticut's Remediation Standards Regulations, R.C.S.A. §§ 22a-133k-1, et seq. (the "RSRs"), as administered by the Connecticut Department of Environmental Protection (now the Connecticut Department of Energy & Environmental Protection or "DEEP").

18. UI made a payment (closing adjustment) of $4,250,000.00 to QE at the time of the transfer of the Property in 2000.

19. In connection with the transfer of the Property, UI and QE executed a Remediation Escrow Agreement dated August 17, 2000 (the "Escrow Agreement"). The Escrow Agreement further delineated the parties' respective obligations relative to pre-closing and post-closing environmental investigation and remediation work associated with the Property.

20. In preparation for the transfer of the Property, UI had GEI Consultants, Inc. ("GEI") prepare a draft Remedial Action Plan (the "RAP"), together with an estimate of the costs to implement the RAP (the "RAP Cost Estimate").

21. The RAP Cost Estimate was $2,000,000; subsequent to closing adjustments, UI placed $1,961,354 in an escrow account ("Escrow Account") pursuant to the terms of the Escrow Agreement.

22. Pursuant to the Escrow Agreement, UI was provided with invoices submitted for disbursement from the Escrow Account and had the ability to review whether such invoices were consistent with terms agreed to in the Escrow Agreement; UI was not entitled to contest or dispute the information, data or conclusions presented by QE's environmental consultant, Advanced Environmental Interface ("AEI").

23. To the best of my knowledge, QE has used all, or substantially all, of the funds in the Escrow Account to conduct investigation and remediation of the Property in accordance with the RAP and its obligations as a Certifying Party under the Property Transfer Act Program.

24. Prior to the transfer of the Property to QE, among the remedial and removal actions performed by UI at the Property were the following:

(a) Chemical and petroleum wastes were removed in 1992, including 13,315 pounds and 966 gallons of hazardous waste that were shipped off-site in 1992 as a "result of placing the power generating plant on deactivated reserve status and eliminating on-site hazardous materials." *GEI Consultants, Inc., Phase I Environmental Site Assessment English Station*, Exh. 9 to Pls.' Local Rule Statement (P000094, P0000102, P0000109, P0000114 and P0000117).

(b) Removal of 324 tons of PCB-impacted soil along the western bulkhead (labeled as "AOC-5") beginning in June 1998. *UI Subsurface Investigation and Remediation Plan Report for English Station*, August 1998, Exh. 1 [UI000859].

25. Throughout its ownership of the Property, UI was proactive in addressing environmental matters as they arose. As documented in GEI's Phase I Environmental Site Assessment, UI complied with CT DEEP spill reporting requirements and promptly responded to spills of hazardous materials.

26. A 1998 report summarizes remedial activities and post-remediation sampling for the action taken in response to the spill discovered during the bulkhead repair being performed by UI. See *UI 1998 Subsurface Investigation and Remediation Report for English Station*, Exh. 1 [**UI000857-UI000860**].

27. UI made determinations to assure proper storage and disposal of PCBs and PCB-contaminated electrical equipment on an on-going basis during its period of ownership of the Property using UI's standard operating procedures. Any PCB-containing equipment stored on the Property was removed prior to the transfer of the Property to QE in 2000.

28. Any equipment potentially containing or contaminated with PCBs which remained on the Property was equipment that was operational and, in QE's opinion, necessary for QE's planned restart of power generating operations at the Property.

*[signature]*

Subscribed and sworn before me this 10TH day of September, 2012,

*[signature]*
COMMISSIONER OF SUPERIOR COURT
Notary Public
My Commission Expires: